Good morning, ladies and gentlemen. Our first case for this morning is Valle against Butler. Mr. Frankel. Good morning, Your Honor. May it please the court, my name is Scott Frankel and I represent the petitioner Ernesto Valle. This is an appeal from the denial of 18 Judge Conelli granted a certificate of appealability on one issue and that was whether the petitioner was denied his constitutional right to due process when the state trial court denied his motion to suppress statements. The standard of review for this court is de novo and the federal court may grant habeas relief if the state court's decision is contrary or we acknowledge that this standard embodies deference to the state court and the state court determinations of this issue. But as this court recently stated in Dassey v. Dittman in granting habeas corpus relief, deference does not preclude relief. Now we understand that, of course, obviously, and the Supreme Court has said much the same thing and you wouldn't bother to have this statute if that were true, but this is a very factually specific area and although his original interrogation, during which he doesn't say anything incriminating, is in the middle of the night, there's then a jump, as I read the record, from about 3.30 in the morning to 9.15 or so, 9.17 that evening, you know, many, many hours later and even if he wasn't sleeping in his cell, it was still a long break and it's just a judgment call for the court to say was he able to respond appropriately. The court says yes. The standard, the Supreme Court has said that the court must look to the totality of the Supreme Standard. Right, and isn't that what the Wisconsin courts did? That was, in Dassey, was the Wisconsin courts. Here we have the Illinois courts. Right, sorry, the Illinois courts, but that, right, Dassey was Wisconsin, but the Illinois court goes through quite a bit of detail. They did go through detail, as the Wisconsin court did, and it is factually specific, but if you look at the facts in this case, I think there's only one way to conclude because all of the facts support a finding that the statement was involuntary. No, they don't. I mean, that's not how the state court looked at it. He's remembering what he said. He's, you know, maybe not the the brightest of people, but he's telling them, you know, where he was and he's involved with the Latin Kings gang. I mean, I don't know what, could the court have found it was involuntary? Sure, it could have, but did it have to? I don't see why. The court, I think, cherry-picked certain details that they observed in the video of the statement, but overall, and if you look at the circumstances of the statement in its totality, you see similar facts to what were presented to the court in Dassey. But I don't, but Dassey isn't our lodestar. It's what the Supreme Court says, and if, you know, we've got this very lengthy break in time and he, you know, the video doesn't seem to reveal that he's overwhelmed. I think the break in time actually weighs in favor of an involuntary statement. The petitioner Ernesto was arrested at 1 o'clock a.m. on the 12th, and it was after he had already spent a night drinking, so he was probably still... But he doesn't say anything in that first round of conversations. He doesn't say anything incriminating. The incriminating things come out almost, well, not quite 24 hours later, but maybe 18 hours later. Right, after he's spent a long time in But he's not being interrogated by the police. He's in a cell. There is a bunk in the cell. It's not really the police's fault that he's not sleeping. Well, he's 18 years old. There was evidence presented in the trial court, in the state trial court, that he was a student who was in special education classes throughout his career, his student career. He was denied, he didn't have any access to a lawyer during that period of time or family members. He might have been... But he's 18. He's not of the age that one would assume he needs a family member. Well, right. He wasn't a juvenile. He was just barely an adult. He was clearly browbeaten, yelled at, sworn to by the detectives throughout the interrogation, and then at the second interrogation, an FBI agent came to him and lied to him about two specific and important facts. They used deception in an attempt to induce him to make a statement, which has been, deception has been found to be an element in determining whether a statement is involuntary or not. But the Supreme Court has never said the deception is impermissible. Right, I think it's one of the factors to consider here, but it's certainly a strong factor in light of the lengthy custody, the lack of sleep, the age of the petitioner, his mental condition, the fact that he was being yelled at by a rotating round of detectives who kept changing. The FBI agent came in and said that he had killed a cooperating informant and that his sentence would be much higher unless he cooperated with them, and she actually showed him a disc and said that he had been recorded bragging about the murder. And so after that lengthy custody, all the interrogation, the being yelled at and being promised things, if you just tell us that it was a mistake. But what was the promise? There was some discussion both in the district court opinion and the state courts. It's not really quite a promise. It's just, you know, a comment, things are going to go better for you. Very vague, if you talk to us. I think it was a little bit more concrete than just a vague statement because they said to him, if you cooperate with us, if you tell us that you did it and you tell us it was a mistake, you didn't mean to kill a federal informant, we'll treat this as a youthful indiscretion. The courts will go much lighter on you. That was the clear implication of what the detectives were saying. But you know, at some level, how is that wrong? So in the federal courts, at least, if you accept responsibility, if you cooperate, you indeed do get a lighter sentence. Why is that a lie? Well, it was a lie here because the detectives were just making it up as they went along. I don't think there was any intention for them to represent to anybody that he had cooperated. They had one goal and they were trying to get this statement, and that was what was If you would like to save rebuttal time, you're free to do so, or not, as you wish. Yes, I will save my rebuttal time. Thank you. Okay. Ms. O'Connell. May it please the court, I'm Assistant Attorney General Erin O'Connell on behalf of the respondent. As this court noted, the totality of the requires a lot of fact-specific analysis and weighing of factors. As a result, the state courts get substantial leeway in applying that test to the facts of a particular case. Here, the state court addressed at length and in great detail the circumstances of the interrogation, and it also explicitly discussed the many factors that the Supreme Court has set forth as relevant to the analysis. Do you think the state court paid enough attention to Mr. Valle's limited mental capacity? The state trial court implicitly found, based on petitioner's demeanor on the video and then his testimony and the evidence before it, that he did not have any sort of a special susceptibility to suggestion or coercion. The court can also see from the videos that he doesn't show any sort of a confusion as to the questions that are being asked. He seems to be aware of his circumstances and the potential consequences of his statements. So as I recall, unlike in the Massey case, we don't have evidence here of exactly any kind of IQ level. Is that right? Exactly. So I think, right, Dassey is instructive on that point. The only evidence here was petitioner's statement that he was in special education classes. In Dassey, there was actually expert testimony where he had tested Dassey on a number of factors in terms of his intelligence and his susceptibility to suggestion and found that he was extremely suggestible according to that data. Ninety-five percent of the population. Exactly. And that, there's no evidence of that here in this record. And the state court, because it was a factual determination that he was entitled to a presumption of correctness and petitioner would have the burden of showing clear and convincing evidence otherwise, and just this bare statement that he was in a special education program doesn't suffice to overcome the state court's factual determination. And because that factual determination was reasonable, the state court also could reasonably conclude, looking at the circumstances of the questioning, that these were simply not coercive tactics absent a showing of some sort of a special susceptibility on the part of petitioner. The sort of cajoling, the entreaties to tell the truth, those are not of a type that would cause an average or even slightly below average person to feel the need to confess. But one of the things Mr. Frankel pointed out or argued was that the police phrased what they were saying, I guess I'll put it that way, in a way that was going to make him think they were promising leniency if he confessed. Why isn't that the right way to look at this? There's no explicit promise on behalf of the investigators. Well, they were being very careful, right? Because they are lying to him. They are saying they're waving around the CD and saying this has you bragging about, you know, the hit and so on. That's true. I would say that it never went beyond this sort of ordinary police tactic of saying, if you confess, things will likely go better for you. And that is just generally true. They never made even a specific promise in their questioning of him. Didn't they go back and forth? I thought they had kind of the good guy, bad guy. They'd have a nice little group, you know, being kind to him and then people would come in and shout at him and then some other nice little group would come in. Unfortunately, I don't know that there there was a set of detectives that we could call the good cops here. There was one central detective, Parrish, who was present at almost every interview except for one where two other investigators came in and they had been interviewing Hector Delgado and he had implicated the petitioner. And they relayed that to petitioner. I don't believe that either of those individuals came back into the process at any point after they had had that sort of an exchange with him. So Del, could you just review for me, my recollection from this record is that apart from Valle's confession, that Delgado also says that Valle is the person who was the shooter. Correct. So he provided testimony that he had actually seen the shooting occur. And Acevedo is like lying down in the back seat or something? Correct. Yeah, right. Right. So his testimony, he didn't actually see the shooting. His testimony was, I heard gunshots. I sat up through the windshield. I saw a petitioner running toward the car with a gun. So that also very strongly supports an inference that petitioner was the one who carried out the shooting. And so it does show, because there were these independent witnesses, that the confession itself was not necessarily the linchpin to the state's case. And in this habeas matter, even if the court were to conclude that it was an involuntary confession, and I don't think the court should reach that conclusion, even then it should find that there was no substantial and injurious effect here, because there was such detailed testimony from those two individuals. And that petitioner's confession, I think, really its role in establishing his guilt was limited to his taking responsibility for the shooting. I think it's also important to look at what he did not concede throughout his interrogation. He eventually, you know, he broke down and said, I'm the one that did the shooting, but he never gave an explanation as to his motive. I was gonna say, I couldn't figure out from start to finish in this case whether he was just sort of going out and randomly shooting at the next car that came by, or whether there really was some grudge against the victim, or what was going on. So petitioner made it sound as if he had just gone out and decided to shoot a random person. Delgado and Acevedo testified that the Enrique Torres, who was the enforcer of the Latin Kings, had actually given him the gun and had a discussion with him, and then it was based on... To go shoot Lozano, or to... It's not entirely clear that Lozano... Go shoot somebody. Well, that's what I'm asking. Lozano or somebody, you know. Kill somebody. I would say the specific party. I don't know that it's clear that Lozano was actually the intended target or not, and he was actually driving someone else's car at the time, which suggests it could also have been a mistaken identity case. But petitioner never implicated Enrique Torres, and it came from Delgado and Acevedo that they provided this necessary context. Petitioner did this at the instruction of the enforcer, and that he did it for the purpose of making sure that he was not guilty of any crime. So, the question is, did the enforcer make those concessions in his interview? And I think it's notable that there was a lot of pressure on him, especially at the first interview, to try to pin the blame on someone else who may have been using him, who may have been threatening him to try to carry this out, that he would have some sort of a compulsion defense. He never at any point, though, pointed the finger at Torres or gave any sort of an explanation as to his motive. So, in that way, I think Delgado and Acevedo gave more persuasive testimony, not only as to the exact circumstances of the shooting itself, but to the surrounding circumstances that explain why they were there in the first place. Maybe this was just a comment on the effectiveness of the Latin King enforcement structure. He would rather face the courts than the enforcer. I think that's a fair inference, yes. And Torres actually even testified at his trial on his behalf and sort of denied what had happened at the party earlier that night. So, he did, I think, kind of repay that sort of loyalty in that way, and that he did testify for the defense. But, in conclusion, I think the court, the Illinois Appellate Court, discussed all of this at great length. It recognized the factors that may have tended to support involuntariness, and it considered whether those were sufficient under the circumstances. And in weighing those factors, it came to the reasonable conclusion that this was a voluntary confession. So, we would ask the court to affirm the denial of habeas relief. All right, thank you. Anything further, Mr. Frankel? The respondent argues that any error here would have been harmless because of the evidence in the case. Actually, the evidence was pretty closely balanced. There was no physical evidence connecting Ernesto Valle to this of Delgado and Acevedo. Why is that so bad, though? They were both, well, Delgado especially was testifying pursuant to an explicit agreement that allowed him to plead to a lesser charge where he received 10 years at 50%. And Acevedo, even though he was in the car, claims to have witnessed the shooting, at least the sound of the shooting, and seeing Petitioner running back from the scene of the crime, was not charged at all with an offense. I think that shows that the question was, well, how do we get to a conclusion in order to win this case? What we're talking about here is not only the credibility or reliability of the statement, but a matter of fundamental fairness. And I think that the circumstances of this interrogation were egregious. They took place over 18 hours with a very young person, not a juvenile but young. He stood his ground for a long time, yes, but when he was finally lied to after 18 hours and sleep deprivation and being isolated from anyone he knew or phone calls or anything, he did tell them what they wanted to hear. And under these circumstances, we argue that the state got it wrong and their opinion was incorrect and not consistent with the intention and the explicit statements in Supreme Court precedent on these issues. And for all these reasons, we would ask the court to grant the relief that we asked for in our brief. Thank you very much. All right, thank you very much. The court will take the case under advisement.